# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Geraldine Soat Brown | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 3821 | **DATE** | 7/17/2003 |
| **CASE TITLE** | | Embry vs. Barnhart | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  The Commissioner's motion for summary judgment is denied and the plaintiff's motion for summary judgment is granted as set out in the attached memorandum opinion and order. The case is hereby remanded to the Commissioner of Social Security for further proceedings consistent with the attached memorandum opinion and order. Enter Memorandum Opinion and Order.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | number of notices |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | JUL 18 2003 |
| | Docketing to mail notices. | date docketed |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | docketing deputy initials |
| | | 7/17/2003 |
| MW | courtroom deputy's initials | date mailed notice |
| | | MW |
| | | mailing deputy initials |

U.S. DISTRICT COURT
CLERK

03 JUL 17 PM 5:05

Date/time received in central Clerk's Office

**Document Number**

31

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION



**DOCKETED**

JUL 1 8 2003

|  |  |
|---|---|
| WILLIE EMBRY,<br>      Plaintiff, | )<br>)<br>)    Cause No. 02 C 3821<br>) |
| v. | )    Magistrate Judge Geraldine Soat Brown<br>) |
| JO ANNE B. BARNHART, Commissioner<br>of Social Security,<br>      Defendant. | )<br>)<br>) |

## MEMORANDUM OPINION AND ORDER

Willie Embry ("Plaintiff") brought this action pursuant to 42 U.S.C. § 405(g) for judicial review of the decision of the Commissioner of Social Security denying his application for Disability Insurance Benefits[1] under the Social Security Act. (R. 125)[2]; *see* 42 U.S.C. § 423 *et seq.* The Commissioner denied Plaintiff's application for disability benefits initially and on reconsideration. (R. 82, 87.) Plaintiff requested and received a hearing before an Administrative Law Judge ("ALJ"), who rendered an unfavorable decision. (R. 20.) After the Appeals Council of the Social Security Administration's Office of Hearings and Appeals ("Appeals Council") declined his request for review (R. 4), Plaintiff filed the present action. [Dkt # 1.] The parties have filed cross-motions for summary judgment under Fed. R. Civ. P. 56 [dkt ## 20, 22], and have consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c)(1). [Dkt ## 13, 14.] Thus, the decision of this court

---

[1] Plaintiff's Memorandum refers to an application for Supplemental Security Income but the application in the record is for Disability Insurance Benefits. (Pl.'s Mem. at 1; R. 125.)

[2] "R.___" refers to the certified record of proceedings, evidentiary documents, and administrative hearing transcripts prepared by the Social Security Administration's Office of Hearings and Appeals pursuant to 42 U.S.C. § 405(g).

1

constitutes the final ruling on the cross-motions. For the reasons set forth below, the Commissioner's Motion for Summary Judgment is DENIED, Plaintiff's Motion for Summary Judgment is GRANTED, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

As a preliminary matter, it must be stated that the tenor of the proceedings before the ALJ in this case was unusual. Proceedings before the ALJ are intended to be non-adversarial. *Williams v. Massanari*, 171 F. Supp. 2d 829, 833 (N.D. Ill. 2001). Moreover, the ALJ is required to develop a "full and fair" record. *Smith v. Apfel*, 231 F.3d 433, 437 (7th Cir. 2000). In this case, however, the record indicates that the ALJ failed to comply with that obligation. At the hearing, the ALJ repeatedly cut Plaintiff off as Plaintiff attempted to answer questions fully. (*See, e.g.*, R. 36-37, 48, 50, 54, 58, 65, 69-70.) The ALJ provided answers to questions he had asked Plaintiff (R. 50, 56, 61-62, 70), and questioned Plaintiff in an adversarial manner. (R. 49.) The ALJ also summarized Plaintiff's answers in his own words and added details not testified to by Plaintiff. (*E.g.* R. 40, 49.)[3]

---

[3] The following exchange between Plaintiff and the ALJ is characteristic of many at the hearing in this case:

> Q: Why did you stop being a security guard?
> A: Because I didn't have any driver's license, and they said I had to have a driver's license to–
> Q: Well, the record would indicate here that you had an angioplasty . . . So that was a couple two or three months before you worked as a security guard. You had the surgery in July 1998, do you remember, when you had the surgery in your legs?
> A: Yeah.
> Q: Bypass graft, but then the–after that they said there was no blockage, they did a good job on you, and–but then you took a job as a security guard.
> A: Yeah, okay.
> Q: So obviously your leg must have improved. I mean, you–did the pain go away?
> A: I thought it was improved, but it never improved. It–the pain come back off and on, you know what I mean.
> Q: Yeah, off and on, but that wasn't the reason why you left the security guard, was

Finally, the ALJ appeared to mock Plaintiff (R. 37), belittle his impairments (R. 61, 65), and to dispense medical advice. (R. 59.) One result of this style of "questioning" was to render Plaintiff's testimony on several important issues confusing or ambiguous.[4]

## BACKGROUND AND MEDICAL HISTORY

### A. Background

Plaintiff was born in May, 1943 and was 58 years old at the time of the hearing, held in June, 2001. (R. 19, 21.) The extent of Plaintiff's education is unclear. In his disability report Plaintiff indicated that he had completed the 12th grade. (R. 141.) However, he testified at the hearing that he did not complete high school. (R. 36-37.) Plaintiff explained that "they just like put me through, you know, the last year, couple years, they just–they put me through some kind." (R. 37.) Later in the hearing the ALJ returned to the subject of Plaintiff's education and Plaintiff testified that he effectively dropped out of school in the tenth grade because he was working. (R. 39-40.) The ALJ then confirmed that the Plaintiff could read some of the words in the newspaper and write a note if necessary. (R. 40.) The ALJ did not further clarify the extent of Plaintiff's education but proceeded on the assumption that Plaintiff had a 12th grade education. (R. 73, 19.)

Plaintiff testified that he has held at least four jobs. Although not mentioned elsewhere in

---

it? Not all the way, but I left because I had numbness in my toe, then, when I had to do a lot of walking. See, anything on these different jobs, and some of the jobs I could do, some of them I couldn't.

(R. 48-49.) The last question presumably includes Plaintiff's answer, contrary to the appearance in the transcript.

[4]  This problem is further exacerbated by errors in the transcript supplied by the Commissioner, *e.g.* R. 42 (missing page), which subsequently was supplemented on July 14, 2003, R. 49.

the record, Plaintiff's attorney stated that Plaintiff picked cotton "as a kid." (R. 35.) Plaintiff worked for U.S. Steel from 1964 to 1966 as a bar straightener. (R. 41-43.) He then worked for the Ford Motor Company from 1966 to 1997 in a variety of assembly line positions. (R. 43-44.) Finally, he worked as a security guard from October, 1998 to either December, 1998 (R. 46, 135, 144; Def.'s Mem. at 2), or February, 1999. (R. 174.) The ALJ adopted the later date without discussing the contrary evidence. (R. 16.)

The record is not clear as to why Plaintiff left his job as a security guard. At one point in the hearing he stated that he stopped because he did not have a driver's license, but Plaintiff's testimony was cut off by the ALJ before he finished explaining why a license was necessary. (R. 48; *see* footnote 3, *above*.) Later in the hearing the ALJ returned to the issue of why Plaintiff left his job, and both the ALJ and Plaintiff's attorney questioned Plaintiff on this issue. Questioned by his attorney, Plaintiff explained that he left the security guard job because the walking and climbing required by certain assignments was more than he could handle and he had no choice about which assignments he was given. (R. 69.) Questioned by the ALJ Plaintiff then seemed to suggest that he quit due to a transportation problem. (R. 69-70.) Questioned again by his attorney Plaintiff re-asserted that he could not fulfill the requirements of some of the jobs he was assigned. (R. 70.) Questioned again by the ALJ and his attorney Plaintiff again stated that he was not able to do all of the things that he was required to do on the security job. (R. 70.) In his decision, the ALJ stated that "claimant testified that . . . he quit his security guard job due *only* to transportation problems, not his medical condition." (R. 18, emphasis added.) The ALJ did not discuss Plaintiff's testimony that he could not do all of the the walking and climbing required in the security guard job.

4

## B. Medical History

### I. Anosmia

Plaintiff suffers from anosmia.[5] Plaintiff was examined at least four times by Dr. Robert

Naclerio, a professor and chief of Otolaryngology-Head and Neck Surgery at the University of

Chicago. (R. 371-74.) Dr. Naclerio ordered a CT scan and prescribed several medications. (*Id.*)

In a December 16, 1999 letter, Dr. Naclerio stated that "[m]y impression is that [Plaintiff] has most

likely lost his sense of smell related to a viral infection and it will not return." (R. 372.) Plaintiff

also suffers some lack of taste. (R. 374.) Plaintiff does not allege that his anosmia has limited his

ability to work. (*See* R. 135.)

### II. Peripheral Vascular Disease

Plaintiff has been diagnosed with, and treated extensively for, peripheral vascular disease.

*See, e.g.*, R. 208.[6] Plaintiff's records state that he has undergone at least three surgeries on his legs

with numerous procedures performed as part of each surgery. On July 16, 1997, Plaintiff received

treatment at the Roseland Community Hospitals for "severe claudication."[7] (R. 176.) According

---

[5] Anosmia is the loss or absence of the sense of smell. *Stedman's Medical Dictionary* ("*Stedman's*") 92 (27th ed. Lippincott Williams Wilkins 2000).

[6] Peripheral vascular disease is a disease "of any of the blood vessels of the limbs, especially the legs." E.J. Schmidt, *Attorney's Dictionary of Medicine*, Vol. 4, Letter P (Matthew Bender 2003). There are two types of peripheral vascular disease, peripheral arterial disease, which involves a narrowing and hardening of the arteries, and peripheral veinius disorders such as chronic venous insufficiency, that effect the peripheral veins. Wesley S. Moore, ed., *Peripheral Vascular Disease Overview* <www.heartcenteronline.com\myheartdr\common\articles.cfm?ARTID=444> (accessed July 1, 2003).

[7] Claudication is defined as "a limping; lameness; cramplike pains in the legs." *Attorney's Dictionary of Medicine*, Vol. 2, Letters CH-CZ. Intermittent claudication is caused by a localized lack of blood in the muscles due to a mechanical disruption of the blood supply such as the

to a report prepared by Dr. Sales, these procedures were a right femoral graft,[8] a balloon thrombectomy,[9] and a balloon angioplasty.[10] (R. 176.) According to a report prepared by the surgeon, Dr. So, the procedures were a right femoral graft exploration, a venogram,[11] a thrombectomy, a graft arteriogram[12] and a balloon angioplasty. (R. 179.)

On August 29, 1997, Plaintiff underwent another set of procedures at the Roseland Community Hospitals designed to treat thrombosis[13] of his graft, claudication and a lack of pulse in the right foot. (R. 188.) According to Dr. Sales' report the procedures performed were an open femoral popliteal graft thombectomy, a right balloon angioplasty and an arteriogram. (R. 188.) Dr. So's report adds an inguinal exploration to that list. (R. 191.)

A lower extremity arterial resting segmental pressures examination administered on June 30, 1998 showed "severe right lower extremity arterial insufficiency," among other findings. (R. 255.) On July 24, 1998, Plaintiff underwent a right femoral to below knee popliteal artery bypass graft with reverse saphenous vein at the University of Chicago Hospitals.[14] (R. 295.) Plaintiff's University of

---

narrowing of an artery. It is characterized by attacks of lameness or pain brought on by walking. *Stedman's* at 360.

[8] A femoral graft is the transplantation of tissue or an organ in the femur or thigh. *Stedman's* at 655, 765.

[9] A thrombectomy is the excision of a clot within a blood vessel. *Stedman's* at 1830, 1832.

[10] A balloon angioplasty is the recreation of a blood vessel involving dilation of the vessel with a balloon. *Stedman's* at 83.

[11] A venogram is an x-ray of a non-transparent vein. *Stedman's* at 1951, 1504.

[12] An arteriogram is an x-ray picture of an artery. *Attorney's Dictionary*, Vol. 1, Letter A.

[13] A thrombosis is a clot within a blood vessel. *Stedman's* at 1831.

[14] A saphenous vein is a vein within the leg. *Stedman's* at 1592.

6

Chicago Hospital records state that Plaintiff "has undergone multiple thrombectomies of thrombose grafts," (R. 269), seven right lower extremity revasculizations, one left lower extremity revasculization and bilateral lower extremity bypasses. (R. 294.) There is reference to a "fem/pop bypass" performed at Holy Cross Hospital in February, 1998 but no record from that hospital. (R. 244.)

Dr. James McKinsey of the University of Chicago Vascular Clinic, the attending physician at Plaintiff's July, 1998 operation, noted in September, 1998 that Plaintiff reported he was able to walk three miles without difficulty, although he experienced intermittent swelling in his right leg. (R. 242.)

A lower extremity arterial resting segmental pressures examination administered on September 8, 1998 reported no evidence of lower extremity arteria insufficiency or stenosis.[15] (R. 212.) Dr. McKinsey reported in December, 1998 that Plaintiff had no further complaints of claudication or rest pain. (R. 238.) An examination performed on April 27, 1999 reported no evidence of stenosis, and resting segmental pressure indexes of one or greater except in the right brachial "PT ankle," for which no information is provided. (R. 239.) A bypass graft surveillance dated June 6, 2000 reported normal ankle pressure indices in both extremities. (R. 219.)

On August 4, 2000, Plaintiff reported that he took Ibuprofen and "sometime Tylenoyl [sic]"[16]

---

[15] Stenosis is abnormal narrowing. *Attorney's Dictionary of Medicine*, Vol. 5, Letter S.

[16] Regular Strength Tylenol is indicated for treatment of minor aches and pains, and fever reduction. *Physician's Desk Reference for Nonprescription Drugs and Dietary Supplements*, 647-48 (22nd ed. Medical Economics Co. 2001).

(R. 168.) On November 20, 2000, Plaintiff reported that he was taking 800mg of Ibuprofen[17] three to four times a day. (R. 173.) He also reported taking 200mg doses of Aleve[18] as needed. (R. 173.) At the hearing Plaintiff stated that he is taking a lot of painkillers. (R. 51.)

Dr. Angelito Bernardo, a consultive examiner ("CE") completed a consultive examination of Plaintiff for the Bureau of Disability Determination Services on October 16, 2000. (R. 365.) He reported that Plaintiff complained of "cramps and pain on both of his lower extremities" that restrict his ability to walk. (R. 366.) Plaintiff also complained of a persistent "old burn oil smell." (*Id.*) In his examination Dr. Bernardo noted "markedly diminished femoral pulses bilaterally . . . as well as diminished popliteal and dorsalis pedis pulses bilaterally." (R. 367.) He observed "severe diminution of pulses" in both legs. (R. 368.) He further reported that Plaintiff "walks slowly, albeit with a normal gait" and "has moderate difficulty walking 50 feet because of pain secondary to claudication." (R. 366-67.)

A Residual Functional Capacity Assessment ("RFC") of Plaintiff was completed by Dr. Bone in June, 2000. Dr. Bone reviewed medical records but did not examine Plaintiff. (R. 357-64.) There is some inconsistency and confusion about the report. The RFC is signed by Dr. Bone in the box labeled "medical consultant's signature" and dated "6/19/00." (R. 364.) The RFC is also signed by "R. Angelo, DCA II." (*Id.*)[19] This signature appears across from the date "6/16/00" and the note "I

---

[17] Ibuprofen is used to reduce inflammation. *Attorney's Dictionary of Medicine*, Vol. 3, Letter I.

[18] Aleve is a non-prescription medication indicated for pain and fever. *Physician's Desk Reference for Nonprescription Drugs and Dietary Supplements* at 602.

[19] Presumably "R. Angelo" is "Rose Angelo" printed on the RFC form. (R. 357.) Neither Dr. Bone's nor Ms. Angelo's qualifications appear in the record.

8

have reviewed all the evidence in file and the assessment of 06/19/00 is hereby affirmed as written."
(*Id.*) The RFC (dated June 16 or June 19, 2000), refers to "CE report," presumably the report of Dr.
Bernardo, which was done on October 16, 2000, four months after the purported date of the RFC.
(R. 363, 367.) In addition to these inconsistencies, there are substantive inconsistencies. Dr. Bone
found that Plaintiff could occasionally lift fifty pounds and frequently lift twenty-five pounds, and
could stand or walk for about six hours in an eight hour workday. (R. 358.) Dr. Bone concluded that
Plaintiff should avoid concentrated exposure to extreme heat, cold, wetness and humidity. (R. 361.)
In response to questions about Plaintiff's reported symptoms, Dr. Bone checked boxes indicating that
the severity of the symptoms reported by Plaintiff was consistent with the medical and non-medical
evidence. (R. 362.) However, a note in a different handwriting (presumably that of Ms. Angelo)
states that the "CE report" (presumably Dr. Bernardo's report) that Plaintiff had difficulty walking
fifty feet was not supported by Doppler flow studies showing ankle pressure or the attending
physician's report on June 6, 2000 that Plaintiff can walk one to two miles with out symptoms. (R.
363.) The RFC report concludes, "Therefore, RFC can be affirmed." (*Id.*) The ALJ did not discuss
or try to reconcile these inconsistencies.

In his testimony Plaintiff stated that the furthest he can walk before he has to stop and rest
is "a couple of blocks." (R. 62.) If he rests until the pain stops he can walk another half block. (*Id.*)
As a result "it take[s] me quite a while to walk a mile." (*Id.*) When asked about records which
indicated he had told a doctor he could walk further, he stated that "I think Dr. Penny got that mixed
up. I never told him that [I could walk one or two miles]. He probably said I could walk two miles,

and I told him two blocks." (R. 63.)[20] Plaintiff testified that he could only lift ten to fifteen pounds. (*Id.*)

At the hearing, the ALJ posed several hypothetical questions to Cheryl Hoiseth, the Vocational Expert ("VE"). (R. 72-73.) The ALJ asked the VE to assume the person is 58 years of age, has a 12th grade education, has worked in the positions the VE stated (laborer, assembly line worker and security guard), and to assume that his limitation is to a medium work function, but he should not be in a position or job that would require repetitive walking or climbing. (R. 73.) The VE concluded that Plaintiff could not return to any of his past jobs but that jobs existed at the medium and light work levels. (R. 73-74.) If the RFC were for medium or light work but the worker could not sustain eight hours of work, that would preclude full time work. (R. 75.) The VE testified that if the RFC were "just for an RFC for light work function" then Plaintiff could work as a security guard. (R. 74-75.) If, in addition to the limitation to light, unskilled work without repetitive walking or climbing, the worker needed a sit/stand option, there would be only 2,000 jobs available. (R. 76-77.)

## STANDARD OF REVIEW

The Social Security Act provides for limited judicial review of a final decision of the Commissioner (effectively that of the ALJ where, as here, the Appeals Council has denied the applicant's request for review). Where the ALJ commits an error of law, "reversal is required without regard to the volume of the evidence in support of the factual findings." *Imani v. Heckler*, 797 F.2d 508, 510 (7th Cir. 1986). With respect to the ALJ's conclusions of fact, the reviewing

---

[20] Dr. Penny does not otherwise appear in the record. The name may represent a phonetic spelling of another doctor's name.

court's role is limited. There the role of the district court is only to determine whether the decision of the ALJ is supported by substantial evidence in the record. *Wolfe v. Shalala*, 997 F.2d 321, 322 (7th Cir. 1993). In reviewing the Commissioner's decision, the court may not decide facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *Brown v. Chater*, 913 F. Supp. 1210, 1213-14 (N.D. Ill. 1996). Thus, the court does "not substitute [its] own judgment for that of the ALJ." *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir. 1997). Rather, the court must affirm a decision if it is supported by substantial evidence and the ALJ has made no error of law. *Herr v. Sullivan*, 912 F.2d 178, 180 (7th Cir. 1990); *Edwards v. Sullivan*, 985 F.2d 334, 336-37 (7th Cir. 1993). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Luna v. Shalala*, 22 F.3d 687, 689 (7th Cir. 1994)(quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

When evaluating a disability claim the ALJ must consider all relevant evidence and may not select and discuss only that evidence that favors his ultimate conclusion. *Herron*, 19 F.3d at 333. Where conflicting evidence allows reasonable minds to differ, the responsibility for resolving the conflict falls on the ALJ, not the court. *Herr*, 912 F.2d at 181; *see also Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989)(the ALJ has the authority to assess medical evidence and give greater weight to that which he finds more credible). Where there is a conflict between medical opinions, the ALJ may choose between those opinions but may not substitute his own lay opinion for that of the medical professionals. *Davis v. Chater*, 952 F. Supp. 561, 566 (N.D. Ill. 1996). A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence

in the record. 20 C.F.R. § 404.1527(d)(2); *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

Although the district court's role is limited to determining whether the ALJ's final decision is supported by substantial evidence and based upon proper legal criteria, this does not mean that the ALJ is entitled to unlimited judicial deference. In addition to relying on substantial evidence, the ALJ must articulate his analysis at some minimal level and state his reasons for accepting or rejecting "entire lines of evidence," although he need not evaluate in writing every piece of evidence in the record. *See Herron*, 19 F.3d at 333. Regardless of whether there is adequate evidence in the record to support an ALJ's decision, the ALJ must rationally articulate the grounds for his or her decision, building an accurate and logical bridge between the evidence and his or her conclusions, because the district court confines its review to the reasons supplied by the ALJ. *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). An ALJ's opinion cannot contain conflicting factual determinations. *Smith v. Massanari*, No. 00 C 7504, 2001 WL 936123 at *1-2 (N.D. Ill Aug. 16, 2001).

## THE ALJ'S DECISION

The Social Security Regulations ("Regulations") prescribe a sequential five-part test for determining whether a claimant is disabled. 20 C.F.R. § 404.1520 (2003). Under this test the Social Security Commissioner must consider: (1) whether the claimant has performed substantial gainful activity during the period for which he claims disability; (2) if he has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if the claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the Regulations as being so severe as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the

residual functional capacity, despite his impairment, to perform his past relevant work; and (5) if the claimant cannot perform his past relevant work, whether the claimant is able to perform any other work existing in significant numbers in the national economy, considering his residual functional capacity together with his age, education, and work experience. *Id.*; *see also, Young v. Secretary of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). The claimant bears the burden of proof at steps one through four, after which the burden shifts to the Commissioner at step five. *Id.*

At the first step of the sequential evaluation the ALJ chose not to determine whether Plaintiff had engaged in disqualifying substantial gainful activity because the ALJ denied the claim on an independent ground. (R. 16.)

At the second step of the sequential evaluation the ALJ found that Plaintiff's anosmia was non-severe. (*Id.*) However, he also found that Plaintiff's post-arterial bypass status met the definition of severe. (*Id.*)

At the third step of the sequential process the ALJ found that Plaintiff's condition did not meet or equal the level of severity of any listed impairment. (*Id.*) Section 4.12(B)(1) of Appendix 1 to Subpart P of part 404 can be met by factors including peripheral vascular disease characterized by a "resting ankle/brachial systolic blood pressure ratio of less that 0.50." The ALJ found that Plaintiff's ratio was "greater than one." (R. 16.)

In the body of the opinion, the ALJ determined Plaintiff's RFC to be as follows: "The claimant's impairments preclude only the following work-related activities: lifting more than fifty pounds occasionally or 25 pounds frequently; or performing frequent walking or climbing." (*Id.*) However, in his findings, the ALJ concluded that "the claimant has the residual functional capacity to perform the requirements of work except for lifting more than 50 pounds occasionally or 25

pounds frequently; and ascending stairs." (R. 19.) The findings state nothing about any limitations on standing, walking or sitting. The ALJ also made two different findings regarding whether Plaintiff had the capacity to return to his previous position as a security guard. In finding 7, the ALJ determined that "[t]he claimant is unable to perform any past relevant work." (R. 18.) However, in finding 9, the ALJ determined that "[t]he claimant's residual functional capacity does not preclude the performance of claimant's past relevant work as a security guard." (*Id.*) The ALJ then proceeded to the fifth step of the sequential process and found that there are jobs existing in significant numbers that Plaintiff could perform. (R. 18-19.) At this step the ALJ found that there were other jobs such as hand packer and cleaner/janitor that Plaintiff could perform. (*Id.*)

## DISCUSSION

Plaintiff raises five issues for review. Plaintiff challenges: the ALJ's RFC determination; the ALJ's disregarding of the opinion of CE Dr. Bernardo in favor of the RFC by the non-examining state doctors; the ALJ's decision that Plaintiff's work as a security guard was relevant past work; and the ALJ's credibility determination; and the ALJ's failure to inquire into potential conflicts between the VE's testimony and the Dictionary of Occupational Titles ("DOT").

In addition to the issues specifically raised by the Plaintiff, there is a further issue with the accuracy of the ALJ's factual findings in his opinion. The ALJ must "build an *accurate* and logical bridge from the evidence to [his] conclusion. . . ." *Blakes ex rel Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. June 4, 2003)(emphasis added), citing authority including *Steele v. Barnhart*, 290 F.3d at 941. If the factual basis for the opinion is not an accurate representation of the record, the opinion cannot be sustained.

In the present case, the opinion contains a number of misrepresentations of the record. For example, the opinion states that Plaintiff testified that he can "stand and walk 30 to 40 minutes each." However, while Plaintiff testified he could stand for 30 to 40 minutes (R. 61), he did not testify that he could walk 30 to 40 minutes. Likewise, as discussed above, the ALJ's statement that Plaintiff testified that he quit his security guard job due only to transportation problems and not due to medical problems (R. 18) misrepresents Plaintiff's testimony. The ALJ's opinion states that Dr. McKinsey's notes reflect that "claimant had no leg cramping, but did report leg swelling, *after ambulating more than three miles*." (R.17, emphasis added.) That is not an accurate report of Dr. McKinsey's notes, which actually say that Plaintiff reported that he is able to walk three miles without difficulty, "though he does *intermittently* note swelling of his right lower extremity which has improved with elevation." (R. 242, emphasis added.) Obviously, intermittent swelling is very different from swelling that occurs only after walking three miles. The ALJ discounted the CE's report that Plaintiff had difficulty walking 50 feet, because, the ALJ stated, "the most recent Doppler flow study showed normal ankle pressure." (R. 17-18.) This is misleading in implying that the Doppler was subsequent to the CE's examination, when, in fact, the CE's physical examination that showed "severe diminution of pulses in both legs" (R. 368) was four months *after* the Doppler study.

The ALJ's statement (made three times in the opinion) that Plaintiff "has *at least* a high school education" (R. 18-19, emphasis added) is also hardly a fair reading of the record. The record is devoid of any suggestion that Plaintiff has had any post-12[th] grade education. Indeed, a fair reading of the record raises the question whether Plaintiff's education was, in fact, the equivalent of a 12th grade education or is more aptly characterized as "limited" or even "marginal." *See* 20 C.F.R. § 404.1564 and SSR 82-63. The court takes judicial notice of the fact that the years when Plaintiff,

15

an African-American born in Mississippi in 1943 and reared in Arkansas, was in school were before and just after the decision in *Brown v. Board of Education*, 347 U.S. 483 (1954), when separate but unequal education was the reality in many states. The ALJ's mockery of Plaintiff's attempts to describe his educational experience (*see, e.g.,* R. 37) reveals an appalling insensitivity. To characterize the record as reflecting "at least" a high school education adds injury to insult.

These inaccuracies along with the insufficiency of the record created by the ALJ's handling of Plaintiff's testimony are enough to require remand. However, certain issues raised by Plaintiff should also be corrected on remand.

## A. RFC Determination

Even setting aside the inaccuracies described above, the ALJ's determination of Plaintiff's RFC is problematic. The opinion is vague and internally inconsistent as to Plaintiff's RFC. The opinion initially states that Plaintiff's impairment precludes only lifting more than 50 pounds occasionally or 25 pounds frequently, and "performing frequent walking." (R. 16.) The ALJ did not quantify "frequent" in either the opinion or in his hypothetical to the VE in which the ALJ referred to "repetitive" walking or climbing. (R. 73.) The opinion subsequently refers to the state agency consultants as finding Plaintiff capable of "a *limited* range of medium exertional work." (R. 18, emphasis added.)[21] However, the ALJ never incorporated certain of the limitations found by the agency consultants, specifically that Plaintiff should avoid concentrated exposure to extreme heat, cold, wetness and humidity. (R. 361.) These factors were never mentioned by the ALJ in his RFC or his recitation of the evidence in either the opinion or the hypotheticals posed to the VE. Finally,

---

[21] The opinion refers to the state agency "physicians," but there is no evidence in the record regarding Rose Angelo's qualifications.

the opinion states a finding that Plaintiff has the capacity to do work except for lifting more than 50 pounds occasionally or 25 pounds frequently and "ascending stairs." (R. 19.) That finding says nothing about limitations as to standing or walking, or the other limitations expressed by the state agency consultants in their RFC.

The ALJ's RFC findings fail to comply with SSR 96-8p, which states:

> The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

SSR 96-8p, 1996 WL 374184 at *1.[22] A function by function analysis requires that "each function must be considered separately (e.g., 'the individual can walk for 5 out of 8 hours and stand for 6 out of 8 hours.')" *Id.* at *5. Furthermore, "[t]he RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." *Id.* at *7. Failure to complete the RFC properly "could be critical to the outcome of a case." *Id.* at *3.

For example, the ALJ's opinion fails to address Plaintiff's ability to stand. Standing, like walking, is specifically identified by SSR 96-8p as a factor that must be "considered separately." Although he mentions Plaintiff's testimony that he can stand only thirty to forty minutes, the ALJ did not explain the basis for excluding this limitation from Plaintiff's RFC stated in the opinion. In these circumstances, the court is unable to identify the evidence the ALJ relied upon in reaching his conclusions or the reasons the ALJ believed it supported the conclusions. The ALJ thus fails to build an accurate and logical bridge between the evidence and his conclusions as required by *Hickman v.*

---

[22] Social Security Regulations are binding on the SSA. 20 C.F.R. § 402.35(b)(1).

*Apfel*, 187 F.3d 683, 689 (7th Cir. 1999).

The ALJ's failure to perform and articulate a proper analysis of Plaintiff's RFC is reflected in the fact that the ALJ made two contradictory findings about whether Plaintiff is able to return to his position as security guard. Notably, the VE testified that, in the hypotheticals posed by the ALJ in which Plaintiff was to avoid "frequent walking," Plaintiff could not perform the duties of a security guard. (R. 73.) When the ALJ posed a hypothetical with only a light work function and no other limitations, the VE testified that security guard duty is considered light. (R. 75.) The ALJ's performance of this outcome-critical step was patently inadequate.

Plaintiff asserts that "[a]t no point during the VE's testimony were the Plaintiff's limitations addressed in the context of the jobs that exist in significant numbers, as it must in Step Five." (Pl.'s Mem. at 11.) Plaintiff's argument appears to be that the ALJ's hypothetical question to the VE did not accurately state Plaintiff's limitations as identified by the ALJ. Hypothetical questions to the VE relied on by the ALJ must accurately state the plaintiff's RFC as determined by the ALJ. *See Ehrhart v. Secretary of Health and Human Services*, 969 F.2d 534, 538 (7th Cir. 1992)("the hypothetical question posed by the ALJ was proper because it reflected [the plaintiff's] impairments to the extent that the ALJ found them supported by evidence in the record."). In this case on remand the ALJ must make a properly determined and articulated RFC, which will be reflected in the questioning of a vocational expert.

## B. The Conflict between the Opinion of the CE and the Opinions Expressed by the State Agency Consultants in Their RFC

At the outset, it must be noted that the Commissioner's Memorandum completely mischaracterizes this issue, and thus fails to respond in any way to the legal arguments made by the

Plaintiff based on the regulations governing Social Security determinations. Plaintiff argues that "[t]he CE's opinion [Dr. Bernardo] should have been given more weight than the State agency reviewing physician because he examined Plaintiff instead of simply reviewing medical records, and he is a specialist in internal medicine, whereas the State examiner's specialty, if any, is unknown." (Pl.'s Mem. at 18.) Instead of dealing with that issue, the Commissioner mischaracterizes the issue as an argument by Plaintiff that the ALJ "gave more weight to the state agency physician opinion that he could perform medium work, than to Plaintiff's subjective allegations suggesting far greater limitation." (Def.'s Mem. at 10.) By mischaracterizing the issue, the Commissioner's brief entirely fails to mention, let alone discuss, the relevant regulations, and fails to respond to Plaintiff's arguments.

20 C.F.R. § 404.1527(d)(1) provides, "Generally, we [the SSA] give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you." The regulations also state, "We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5). The ALJ is required to provide support for his decision to grant greater weight to a report by a non-examining physician than that of an examining physician. 20 C.F.R. § 404.1527(d)(2); *Cichon v. Barnhart*, 222 F. Supp. 2d 1019, 1030 (N.D. Ill. 2002)(discussing treating physicians). Finally, unless a treating source's opinion is given controlling weight, the regulation requires the ALJ to "explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist."

20 C.F.R. § 404.1527(f)(2)(ii).[23]

In a footnote, the Commissioner argues that "a fair reading of Dr. Bernardo's report" is that Plaintiff's difficulty walking "less than half a block or more than fifty feet" was a symptom reported by Plaintiff and thus is no more reliable than any of Plaintiff's other statements as to how far he could walk without pain and not entitled to special difference. (Def.'s Mem. at 10, n.8.) That assertion is not supported by the record. Dr. Bernardo's report makes four references to Plaintiff's ability to walk. These references indicate that, while Plaintiff reported his difficulty walking to Dr. Bernardo, Dr. Bernardo also independently evaluated Plaintiff's ability to walk and incorporated his findings into a diagnosis.[24] Significantly, the Commissioner's discussion of this point fails to discuss in any way Dr. Bernardo's finding, based on his examination of Plaintiff, that Plaintiff had "severe diminution of pulses" in his lower right leg. (R. 368.) *See* Def.'s Mem. at 10, n. 8. That objective

---

[23] Plaintiff's initial Memorandum cites 20 C.F.R. § 416.927 (d)(1-2), which is the regulation governing Supplemental Social Security Income applications. The corresponding section applicable to Plaintiff's Disability Insurance Benefits application, 20 C.F.R. § 404.1527(f)(2)(ii), is identical.

[24] Dr. Bernardo's report first notes that Plaintiff stated that "by walking less than half a block, he would also have the claudication." (R. 366.) That is unquestionably a self-report. Dr. Bernardo then notes, under a section titled Physical Examination that Plaintiff "walks slowly, albeit with a normal gait." (*Id.*) It appears that the statement is a result of Dr. Bernardo's personal observation. Dr. Bernardo's report also describes, under the section Degree and Performance of Different Maneuvers, Plaintiff's ability to walk on his toes, heels and in tandem as well as his ability to squat and rise. (R. 367.) It then states, "He has moderate difficulty walking 50 feet because of pain secondary to claudication." (*Id.*) Given the title of the section, the lack of any reference to statements by Plaintiff and the unlikelihood of Plaintiff reporting his ability to, for example, walk on his toes, that section is also apparently based on Dr. Bernardo's observations. Finally, Dr. Bernardo's report states, under a section titled Diagnostic Impression, that Plaintiff "can only walk approximately less than half a block." (R. 368.) A diagnosis is "the determination of the nature of a disease, injury or congenital defect." (*Stedman's* at 491.) Plaintiff's inability to walk more than half a block without pain thus represents Dr. Bernardo's determination, based on both his observations and Plaintiff's reports, and is subject to the deference given to an examining consultant's opinion.

20

medical finding undercuts any argument that the ALJ was entitled to dismiss Dr. Bernardo's findings as a "self-report."

Ultimately, however, it is not the role of the court to re-weigh the evidence, nor may the Commissioner's counsel supply reasoning that the ALJ failed to supply. *E.g., Golembiewski v. Barnhart*, 322 F.3d 912, 916 (7th Cir. 2003). The important point here is that, contrary to the applicable regulations, the ALJ failed to explain in his opinion why he apparently gave greater weight to a non-examining consultant's report based on a Doppler study done in June, 2000 than to the medical findings in an examining physician's report done in October, 2000. Thus, on remand the ALJ must identify the weight granted to the reports of the various consultants and properly justify that determination, as well as dealing with the inconsistencies in the RFC report by Dr. Bone and Ms. Angelo that are discussed above.

## C. Relevant Past Work

As discussed above, the ALJ made a number of contradictory findings, including finding that Plaintiff's job as a security guard constituted past relevant work that Plaintiff could perform (R. 18), and then assuming that Plaintiff could not perform that work and concluding that other jobs existed in significant numbers that Plaintiff could perform. (*Id.*)

The evidence fails to support the ALJ's conclusion that Plaintiff's work as a security guard constituted past relevant work rather than an unsuccessful work attempt. To constitute past relevant work, that work must first rise to the level of substantial gainful activity. *Lauer v. Bowen*, 818 F.2d 636, 639 (7th Cir. 1987). To be considered substantial gainful activity, work must meet certain earnings and length requirements. Under 20 C.F.R. § 404.1574(a)-(b) if an individual's earnings fall

below a certain level, his work does not constitute substantial gainful activity. Regarding length requirements, the regulations state, "Ordinarily, work you have done will not show that you are able to do substantial gainful activity if, after working for a period of 6 months or less, your impairment forced you to stop working" or reduce work to below the amount necessary to meet the earnings requirements. 20 C.F.R. § 404.1574(c)(1). If an individual works for three months or less, the SSA considers that work to be an unsuccessful work attempt if the individual "stopped working, or [they] reduced [their] work and earnings below the substantial gainful activity earnings level, because of [their] impairment or because of the removal of special conditions which took into account [their] impairment." 20 C.F.R. § 404.1574(c)(3). If the plaintiff has worked between three and six months the SSA will consider the work to be an unsuccessful work attempt if "it ended, or was reduced below substantial gainful activity earnings level, within 6 months because of [plaintiff's] impairment or because of the removal of special conditions" and other requirements were met. 20 C.F.R. 404.1574(c)(4). In addition, an individual must be out of work for at least thirty days or have been forced to change to another type of work or employer prior to beginning work that is to be classified as an unsuccessful work attempt. 20 C.F.R. § 404.1574(c)(2).

The ALJ found that Plaintiff worked as a security guard for four months. (R. 16.) The ALJ did not address whether Plaintiff's earnings were sufficient to warrant a finding that his work constituted substantial gainful activity despite the fact that Plaintiff testified he was working "eight hours this week, six hours on one week" and earning minimum wage. (R. 71.) Nor did he properly analyze whether Plaintiff's work ended as a result of his impairment. As discussed above, the opinion states that Plaintiff testified that "he quit his security guard job due only to transportation problems, not his medical condition." (R. 18.) However, Plaintiff's testimony included statements

22

that walking and climbing on some jobs to which he was assigned was more than he could handle and he had no control over the jobs to which he was assigned. (R. 69.) He further testified that there were things he was supposed to do on those assignments that he was unable to do. (R. 70.) The ALJ's opinion makes no effort to address this testimony. In addition, the VE observed at the hearing that Plaintiff's work as a security guard could not be considered as part of his work record because it was too short. (R. 73.) The ALJ's conclusion thus fails to accurately reflect the record and address significant pieces of testimony.

The Commissioner argues that even if the ALJ erred in considering Plaintiff's past work as a security guard as past relevant work this error was harmless. (Def.'s Mem. at 11.) An ALJ's error is harmless if it does "not affect an ALJ's determination that a claimant is not entitled to benefits." *Bacidore v. Barnhart,* No. 01 C 4874, 2002 WL 1906667 at *11 (N.D. Ill. Aug. 19, 2002)(Keys, M.J.). In this case, it is impossible to conclude that the error was harmless. For example, the ALJ's determination that Plaintiff quit his work as a security guard only because of transportation problems was part of the rationale for the ALJ's determination that Plaintiff's report of symptoms was less than credible. (R. 17-18.) On remand, the ALJ will be required to make a proper determination of whether Plaintiff's work as a security guard constitutes past relevant work.

## D. Assessment of Credibility and Pain

Plaintiff argues that the ALJ failed to comply with SSR 96-7p by failing properly to assess the credibility of Plaintiff's testimony about his limitations and pain. (Pl.'s Mem. at 20.) SSR 96-7p requires specific reasons for a credibility finding.

> The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently

23

specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, 1996 WL 374186 at *2. Blanket statements are specifically disproved. "It is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" *Id.*

In assessing the testimony regarding pain the ALJ is required to consider "all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements from you, your treating or examining physician or psychologist, or other persons about how your symptoms affect you." 20 C.F.R. § 404.1529(c)(1). Moreover, the ALJ is specifically required to consider factors relevant to symptoms including daily activities, location, duration and intensity of pain and other symptoms, precipitating and aggravating factors, the type, dosage, effectiveness, and side effects of medication, treatment other than medication received and, measures used to relieve pain or other symptoms. 20 C.F.R. § 404.1529(c)(3).

An ALJ's credibility determination "is afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility." *Shrameck v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). However, the ALJ's decision must contain an accurate and logical bridge from the evidence to the conclusion. *Green*, 204 F.3d at 718.

In this case the ALJ's credibility finding fails to comply with SSR 96-7p. The finding is limited to the statement that "The claimant's allegations of disabling symptoms and limitations are not considered fully credible." (R. 19.) The ALJ does not specify what evidence lead him to this conclusion. Moreover, to the extent the ALJ engages in a general discussion of the evidence, his discussion is based on an incomplete and inaccurate recitation of the evidence in the record.

24

Some of the inaccuracies are discussed above. As a further illustration, the opinion states that Plaintiff "testified that he climbs three flights of stairs to get to his apartment, and he quit his security guard job due only to transportation problems, not his medical condition." (R. 18.) Plaintiff also testified, "I don't go out except when absolutely necessary because I live on the 3rd floor." (R. 162.) That testimony is not addressed by the ALJ. Likewise, the ALJ failed to consider the state agency consultants' finding that the symptoms alleged by Plaintiff were consistent with, and not disproportionate to the medical evidence. (R. 362.) ALJ may not simply select and discuss only that evidence which favors his ultimate conclusion. Rather, "an ALJ's decision must be based upon consideration of all the relevant evidence." *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000)(citation omitted). Furthermore, "[a]n ALJ must consider all of the evidence and discuss significant evidence contrary to her ruling." *Lauer v. Apfel*, 169 F.3d 489, 494 (7th Cir. 1999). The ALJ also noted that the Plaintiff took "only Ibuprofen" for his peripheral vascular disease. (R. 17.) The Seventh Circuit has cautioned against drawing negative inferences from the fact that an individual is not being treated with heavy painkillers. *Green*, 204 F.3d at 782. On remand, the ALJ shall comply with SSR 96-7p.

## E. SSR 00-4p

Plaintiff also argues that the ALJ failed to comply with SSR 00-4p, which states:

Our adjudicators must: Identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by the VEs or VSs and information in the [DOT] . . . and Explain in the determination or decision how any conflict that has been identified was resolved.

. . .

When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's

duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such a consistency.

> When a VE or VS provides evidence about the requirements of a job or occupation, the adjudicator has an affirmative responsibility to ask about any possible conflict between that VE or VS evidence and information provided in the DOT.

SSR 00-4p, 2000 WL 1898704 at *1-2, 4 (2000). SSR 00-4p became effective on December 4, 2000, prior to the date of Plaintiff's hearing. The inquiry described in SSR-004p did not take place in the present case.

Although the language of SSR 00-4p appears to require the ALJ to inquire as to the consistency of the VE's testimony with the DOT on every occasion, the Commissioner argues that, under *Donahue v. Barnhart*, 279 F.3d 441, 446-47 (7th Cir. 2002), the ALJ is only required to ask for clarification if a conflict is identified by Plaintiff and brought to the attention of the ALJ. (Def.'s Mem. at 9-10.)

In the *Donahue* case the court stated that SSR 00-4p "requires an explanation only if the discrepancy was 'identified'–that is, if the claimant (or the ALJ on his behalf) noticed the conflict and asked for substantiation. Raising a discrepancy only after the hearing . . . is too late." 279 F.3d at 446-47. However, the court's statements regarding SSR 00-4p are technically *dicta*. The court observed that SSR 00-4p was "not directly applicable" because that ruling went into effect only after the decision of the ALJ that was the subject of the *Donahue* case. *Id*. at 446. Because the issue may not arise on the remand of this case, this court declines to interpret SSR 00-4p in the context of this case.

## CONCLUSION

For the reasons discussed above, the Commissioner's Motion for Summary Judgment is

DENIED and Plaintiff's Motion for Summary Judgment is GRANTED and the case is remanded to the Commissioner for proceedings consistent with this opinion. This court recommends that, on remand, the case be assigned to a different Administrative Law Judge.

**IT IS SO ORDERED.**

GERALDINE SOAT BROWN
United States Magistrate Judge

**DATED:** July 17, 2003